# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| SCOTT ENVIRONMENTAL SERVICES, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> NEWFIELD EXPLORATION COMPANY, ZACHARY MCCARDELL, and KEVIN PARKER, <br><br> *Defendants*. | Case No. 2:19-cv-00026-JRG-RSP |

## MEMORANDUM OPINION AND ORDER

Defendant Newfield Exploration Company (hereinafter "Newfield") filed a Motion to Stay and Compel Arbitration ("Motion to Stay") (Dkt. No. 14), which is now before the Court.[1] Newfield also filed a Motion for Leave to File Supplement to its Motion to Stay and Compel Arbitration ("Motion for Leave"). (Dkt. No. 30.) Newfield also filed a Motion for Oral Hearing on these Motions. (Dkt. No. 62.)

After consideration, the Court **DENIES** both Newfield's Motion to Stay and its Motion for Leave. Consequently, the Court **DENIES-AS-MOOT** Newfield's Motion for Oral Hearing.

## I. BACKGROUND

This lawsuit involves allegations that Newfield misappropriated confidential information from Plaintiff Scott Environmental Services, Inc. ("Scott"). Scott also alleges that Newfield employees Zachary McCardell and Kevin Parker misappropriated confidential information. Scott

---

[1] Defendant Kevin Parker joined Newfield's Motion to Stay. (Dkt. No. 21.) Defendant Zachary McCardell also joined Newfield's Motion to Stay. (Dkt. No. 33.)

and Newfield entered into a Master Service Agreement, which all parties had signed by April 25, 2013. (Dkt. No. 14-1 at 1.) This agreement refers to Newfield as "Company" and refers to Scott as "Contractor." (*Id*.) The Master Service Agreement includes provisions regarding confidential information that was shared between the parties, including the following language:

> Contractor may disclose confidential information to Company in connection with the services. Company shall treat, protect, and safeguard as proprietary and confidential this Agreement and all confidential information disclosed to Company using at least as great a degree of care as used to maintain the confidentiality of its own confidential information, but in no event less than a reasonable degree of care. Except with specific prior written authorization. Company shall not use any of Contractor's confidential information other than for the purpose for which it has been disclosed. Company will disclose Contractor's Confidential information only to Company's employees who need to know such Information, provided that such employees are bound by terms and conditions protecting such confidential information no less restrictive than those of this Agreement. "Confidential information" as used in this Agreement means any and all (and without limitation) technical and nontechnical information including trade secret, and proprietary information, techniques, models, charts, readings, logs, interpretations, extractions, mappings and integrations, production data, test data, log data, images plots and formulae related to the current, future and proposed work and services, and information concerning product or process research and development, design details and specifications, engineering, financial data, and marketing plans of Company.

(*Id*. at 8.) The Master Service Agreement also included an arbitration provision:

> Any and all disputes claims or controversies arising out of or in connection with this Contract or the furnishing of products and/or services hereunder [herein "Dispute"] shall be referred to and determined by binding arbitration as the sole and exclusive remedy of the parties as to the Dispute. Such arbitration shall be conducted in accordance with the rules of the American Arbitration Association . . . .

(*Id*. at 7–8.)

Three years after entering into the Master Service Agreement, Scott and Newfield entered into a Non-Disclosure Agreement (hereinafter "NDA") on May 16, 2016. (Dkt. No. 14-4 at 4.) Kevin Parker and Zach McCardell, who were employees for Newfield, were also parties to the NDA. (*Id*. at 1, 4.) One stated purpose of the NDA was to allow the observation of Scott's operations. (*Id*. at 1.) The NDA provides that Newfield will not disclose or use for personal or financial gain the operations observed, as well as a long list of other confidential information. (*Id*.) The Non-Disclosure Agreement also includes a forum selection clause, which states that:

> [a]ll parties to this Agreement agree that proper venue for any action of original jurisdiction seeking to enforce this Agreement shall lie in the United States District Court for the Eastern District of Texas, Marshall Division or in a Texas State Court have jurisdiction in Gregg County, Texas and that this Agreement shall be construed in accordance with the laws of Texas and/or any applicable federal law.

(*Id*. at 3.)

## II. NEWFIELD'S MOTION FOR LEAVE TO FILE SUPPLEMENT TO ITS MOTION TO STAY AND COMPEL ARBITRATION

In Newfield's Motion for Leave (Dkt. No. 30), it seeks leave to file a supplement to its Motion to Stay and Compel Arbitration (Dkt. No. 14) to address additional case law. The Court concludes that Newfield has not shown good cause for supplementing its Motion to Stay and Compel Arbitration (Dkt. No. 14) as the newly provided caselaw was available to Newfield at the time Newfield filed its Motion to Stay and Compel Arbitration. Further, even if the Court were to allow supplementation, the Court concludes that the cases set forth by Newfield in its supplemental brief do not justify staying this case and compelling arbitration. The Court therefore **DENIES** Newfield's Motion for Leave.

Newfield seeks to supplement its original briefing with a discussion of *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). This case was decided on January 8,

2019, yet Newfield's Motion to Stay and Compel Arbitration (Dkt. No. 14) was filed on March 13, 2019, over two months after *Henry Schien* was decided. Thus, the *Henry Schien* case was available to Newfield at the time it filed its original motion, but Newfield did not cite to that authority. Furthermore, Newfield filed this Motion for Leave to File a Supplement (Dkt. No. 30) on April 16, 2019, which was roughly one week after the briefing had closed for the Motion to Stay and Compel Arbitration and over three months after *Henry Schien* was decided. Newfield has not provided any adequate reason for why this authority could not have been provided at an earlier date. Further, allowing supplementation would be cause significant prejudice to Scott as briefing for the Motion to Stay had already closed when Newfield filed its Motion for Leave.

The Court also concludes that these amendments would be of minimal importance, suggesting that good cause has not been shown. Even if the Court were to consider Newfield's supplemental authority, that authority would not justify staying this case and compelling arbitration. Newfield argues that

> following the Supreme Court's decision in *Henry*, the Court's analysis can be streamlined to simply confirming that the MSA's arbitration provision incorporates the AAA rules, thereby delegating arbitrability issues to the arbitrators. With that, the Court can, and must, compel Scott to arbitration notwithstanding the parties' various contentions on arbitrability.

(Dkt. No. 30 at ¶ 3.)

The Court does not agree with this interpretation of *Henry Schein* as the Supreme Court explicitly stated

> [w]e express no view about whether the contract at issue in this case in fact delegated the arbitrability question to an arbitrator. The Court of Appeals did not decide that issue. Under our cases, courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." On remand, the Court of Appeals may address that issue in the first

> instance, as well as other arguments that Archer and White has properly preserved.

*Henry Schein, Inc. v. Archer & White Sales, Inc*., 139 S. Ct. at 531.

Determining who has the primary power to decide arbitrability turns on the agreement between the parties. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co*., 687 F.3d 671, 675 (5th Cir. 2012) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). The Fifth Circuit "will not assume that the parties agreed to arbitrate arbitrability '[u]nless the parties clearly and unmistakably provide otherwise.'" *Id*. (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 649 (1986)). *Henry Schein* actually confirms that standard. 139 S. Ct. at 531 (stating that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so").

While the *Petrofac* court stated that "[t]he express adoption of [the American Arbitration Association] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability," *id*., other courts have concluded that no such clear and unmistakable evidence existed of intent to arbitrate arbitrability where multiple conflicting agreements had been made. *PoolRe Ins. Corp. v. Organizational Strategies, Inc*., No. CIV.A. H-13-1857, 2013 WL 3929077, at *7 (S.D. Tex. July 29, 2013), *aff'd*, 783 F.3d 256 (5th Cir. 2015), and *aff'd*, 783 F.3d 256 (5th Cir. 2015). In *PoolRe*, the Southern District of Texas stated that "the court must consider the interaction of multiple agreements in assessing whether there is 'clear and unmistakable evidence' regarding the question of 'who determines arbitrability' in this case." *Id*. While the parties' original agreement may have provided clear and unmistakable evidence if it was the only agreement, the court determined that a subsequent agreement with a forum selection clause conflicted with the original agreement. *Id*. The Court concluded that the conflicting provision in the subsequent agreement regarding arbitrability gave rise to a dispute as to whether the parties had revoked the

delegation clause of the earlier agreement and that, "[a]t the very least, the existence of this dispute indicates that the parties' intent is ambiguous, thereby precluding a finding that the services agreement 'clearly and unmistakably' reaffirms the delegation clause." *Id*. at 8. Thus, the court applied the default rule of judicial construction. *Id*.

The Court concludes that this dispute is analogous to the dispute presented in *PoolRe* and that no clear and unmistakable evidence has been presented to resolve the question of "who determines arbitrability" here. The parties in this case originally entered into a Master Services Agreement, which requires that

> [a]ny and all disputes claims or controversies arising out of or in connection with this Contract or the furnishing of products and/or services hereunder [herein "Dispute"] shall be referred to and determined by binding arbitration as the sole and exclusive remedy of the parties as to the Dispute. Such arbitration shall be conducted in accordance with the rules of the American Arbitration Association. . . .

(Dkt. No. 14-1 at 7–8.) The parties then entered into a Non-Disclosure Agreement providing that

> [a]ll parties to this Agreement agree that proper venue for any action of original jurisdiction seeking to enforce this Agreement shall lie in the United States District Court for the Eastern District of Texas, Marshall Division or in a Texas State Court have jurisdiction in Gregg County, Texas and that this Agreement shall be construed in accordance with the laws of Texas and/or any applicable federal law.

(Dkt. No. 14-4 at 3.)

Just like in *PoolRe*, a subsequent agreement (the Non-Disclosure Agreement) was made here that included a forum selection clause instead of an arbitration provision. At the very least, this subsequent Non-Disclosure Agreement creates ambiguity as to the parties' intent regarding the issue of whether the question of arbitrability itself should be arbitrated. Thus, the agreements, when construed together, do not "clearly and unmistakably" suggest that the question of

arbitrability should be decided by the arbitrator, so the Court will apply the default rule of judicial construction like the Court in *PoolRe*. Consequently, the importance factor suggests that this Motion for Leave should be denied.

The Court therefore **DENIES** Newfield's Motion for Leave to File Supplement to Its Motion to Stay and Compel Arbitration, but the Court has considered all current authorities, including *Henry Schein*.

### III. NEWFIELD'S MOTION TO STAY AND COMPEL ARBITRATION

"When considering a motion to compel arbitration under the FAA, a court employs a two-step analysis." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006). The first step is to "'determine whether the parties agreed to arbitrate the dispute in question.'" *Id.* (quoting *Webb v. Investacorp., Inc.*, 89 F.3d 252, 258 (5th Cir. 1996)). This first step requires that two separate issues be resolved—"(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (quoting *Webb*, 89 F.3d at 258); *see also Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 914 (5th Cir. 2014) (citing *Sherer v. Green Tree Servicing, LLC*, 548 F.3d 379, 381 (5th Cir. 2008)). If the parties agreed to arbitrate the dispute in question, then the Fifth Circuit directs courts to determine "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Tittle*, 463 F.3d at 418. (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 628 (1985)). Neither party has argued that external legal constraints foreclose arbitration of any claims, so the Court concludes that the second step is satisfied. Accordingly, the Court will focus its analysis on the first step and the question of whether the parties agreed to arbitrate the dispute in question.

"[T]he question whether an arbitration provision conflicts with other dispute resolution provisions is properly analyzed under the 'validity' step of the arbitration analysis." *Sharpe*, 769 F.3d at 915. In determining whether a valid agreement to arbitrate the claims exists, state contract law is used and the Federal Arbitration Act's presumption in favor of arbitration is not implicated. *Id.* (citing *Klein v. Nabors Drilling USA L.P.*, 710 F.3d 234, 236–37 (5th Cir. 2013)) (internal citations omitted).

The Court concludes that the parties do not have a valid agreement to arbitrate the claims at issue here. The Court reaches this conclusion because (1) the Amended Complaint is based on violations of the NDA and not the MSA; (2) the parties entered into the NDA after the MSA; (3) the MSA provides that the terms of any special agreement shall control over the terms of the MSA where there is conflict.

The language within the Amended Complaint is based on the NDA and not the MSA. The Amended Complaint refers to certain confidential information that was covered by the NDA that was allegedly misappropriated by Newfield. (Dkt. No. 6 at ¶ 8. *Compare* Dkt. No. 6 at ¶ 9 *with* Dkt. No. 14-4 at ¶ 2.2.) The Complaint alleges that Scott provided to Defendants a confidential presentation on October 13, 2014, discussing "the Firmus® Process including design, operations, and quality control," "sampling and testing, including the basis of the Scott Sampling Procedure," "[c]hemical testing procedures for chlorides and sulfates," and "geotechnical testing processes including gradation and moisture content determinations." (Dkt. No. 6 at ¶ 9.) The Complaint also alleges that this confidential information and other confidential information described within the NDA was misappropriated. (*Id.* at ¶¶ 9–15.) The Amended Complaint does not reference the MSA.

Further, the NDA was entered after the original MSA and the first amended version of the MSA were entered into. The parties agreed to the forum selection clause after they agreed to the

arbitration provision, and this suggests that the terms of the NDA controlled over the terms of the MSA and that there was no valid agreement to arbitrate between the parties. Newfield argues that a second amendment of the MSA was filed in January 2017 and that, because this amendment of the MSA was entered into after the NDA was entered into, the second amendment of the MSA controls over the NDA. (Dkt. No. 14 at 6.) However, the second amendment of the MSA appears to have been undertaken solely to make a name change from Scott Environmental Services International LLC to Scott Energy Technologies LLC. (*See* Dkt. No. 14-3 ("The Agreement is hereby amended to replace the name of Scott Environmental Services International, LLC with SCOTT ENERGY TECHNOLOGIES LLC, therein. . . . All other terms and conditions of the Agreement shall remain unchanged.").) Because this subsequent amendment solely was directed to making a name change, the Court gives little weight to the argument that the second amended version of the MSA controls simply because it is the last agreement that was entered into.

Additionally, one provision within the MSA suggests that the NDA should actually control here. The original MSA states:

> Should the parties hereto enter into any future formal written agreement (excluding "work orders", "job tickets", or other similar pre-prepared forms submitted by [Scott Environmental Services, Inc.]) specially prepared to provide for a particular job to be done or service to be rendered by [Scott Environmental Services, Inc.], then, in the event of a conflict between the terms of such agreement and the terms of this Contract, the terms of the special agreement for the particular job or services shall prevail.

(Dkt. No. 14-1 at § XII.) This provision was unaffected by later amendments, and it suggests that the provisions within the NDA should prevail. The NDA was a formal written agreement prepared to provide for a particular job to be done or service to be rendered by Scott Environmental Services, Inc. Within the Recitation of Purposes section of the NDA, Scott permitted Newfield to observe Scott's operations to see if any of the techniques employed by Scott could be adapted to improve

the efficiency of Newfield's other operations. (Dkt. No. 14-4 at ¶ 2.1.) The NDA and the MSA conflict with each other as one includes a forum selection clause while the other includes a mandatory arbitration provision. Thus, according to the terms of the MSA itself, the terms of the NDA shall prevail.

Newfield asserts that the arbitration provision within the MSA controls here over the forum selection clause of the NDA. Newfield relies on several arguments that the Court did not address above. First, Newfield argues that the NDA does not specifically preclude arbitration and that "a forum selection clause cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration." (Dkt. No. 27 at 7.) Second, Newfield argues that the NDA and the MSA are not between the same parties and that the NDA may not supersede the MSA as a result. (Dkt. No. 14 at 7.) Third, Newfield argues that the NDA was entered into after confidential information had been disclosed to Newfield (Dkt. No. 14 at 6–7.) Fourth, Newfield argues that the NDA does not cover information that Scott discloses to Newfield directly. (*Id*. at 5).

Newfield's first argument is that the NDA does not specifically preclude arbitration, and "a forum selection clause cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration." (Dkt. No. 27 at 7 (citing *Pers. Sec. & Safety Sys. v. Motorola Inc*., 297 F.3d 388, 396 n.11 (5th Cir. 2002) (hereinafter "*Personal Security*")). However, the present situation is similar to *Berg v. Faulkner*, 2007 U.S. Dist. LEXIS 72486 (N.D. Tex. 2007) and is distinguishable from *Personal Security* due to the lack of temporal proximity between the NDA and the MSA. In *Berg*, an Agreement was entered into containing an arbitration provision, and a Note was subsequently entered into roughly a year later that contained a forum selection clause. *Id.* at *2–3. The critical issue in *Berg* was whether the arbitration provision controlled, and

the Court concluded that it did not. *Id*. at *8–*14. In reaching its decision, the *Berg* court distinguished *Personal Security*, noting that the Fifth Circuit in *Personal Security* was

> considering clearly related agreements that were contemporaneously executed. There is no temporal proximity or evidence in this case suggesting that the Note and the Agreement are related. The court need only look at the terms of the Note to determine if there is an agreement to arbitrate.

*Id*. at *11–12; *see also I.D.E.A. Corp. v. WC & R Interests, Inc*., 545 F. Supp. 2d 600, 608 (W.D. Tex. 2008) (citing *Personal Security*, 297 F.3d at 393) ("Separate agreements should be construed together if they are executed contemporaneously, 'for the same purpose' and as 'interrelated parts of one deal,' and if 'the arbitration provision is contained in an agreement that [is] essential to the overall transaction.'"). Similarly here, the MSA and the NDA were not entered contemporaneously—the NDA was entered into three years after the MSA. Further, the MSA and the NDA do not reference each other in any way to suggest that the two agreements are related. Thus, the Court need only look at the terms of the NDA here to determine if there is an agreement to arbitrate.

Newfield's second argument that the NDA and the MSA are not between the same parties is also unpersuasive. The Complaint is based on violations of the NDA. As asserted by Scott, the NDA is a standalone agreement with independent legal significance here. Further, the Court gives little weight to Zach McCardell's and Kevin Parker's inclusion as parties to the NDA since both McCardell and Parker are expressly identified in the NDA as agents of Newfield. (Dkt. No. 14-4 at ¶ 1.) The argument that the NDA does not cover some types of disclosures goes to the merits of Plaintiff's claims rather than to the appropriate forum.

## IV. CONCLUSION

The Court **DENIES** Defendant Newfield Exploration Company's Motion to Stay and Compel Arbitration. The Court also **DENIES** Newfield's Motion for Leave to File Supplement to its Motion to Stay and Compel Arbitration. The Court **DENIES-AS-MOOT** Newfield's Motion for Oral Hearing.

**SIGNED this 22nd day of October, 2019.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE